# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ADRIENNE GALT and NANCY MURPHY,**<br>**for themselves and all others similarly situated,**<br>**Plaintiffs,**<br>**v.**<br><br>**EAGLEVILLE HOSPITAL,**<br>**Defendant.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:     **Case No. 15-cv-6851** |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                    **April 19, 2018**

The parties have reached a settlement in this case brought under the Fair Labor Standards Act[1] ("FLSA") and the Pennsylvania Minimum Wage Act[2] ("PMWA"), and seek final approval of their agreement, including an award of attorneys' fees and costs, and incentive payment to class representatives, along with final certification of the settlement class and collective. Following a final approval hearing held on April 2, 2018, and for reasons that follow, the Court will grant the motion.

## I.      BACKGROUND

Named Plaintiffs Adrienne Galt and Nancy Murphy are former registered nurses at Defendant Eagleville Hospital. In December 2015, they filed this class and collective action on behalf of themselves and other similarly situated employees of Eagleville Hospital, alleging that Defendant violated the FLSA and the PMWA by requiring them to work during 30-minute unpaid meal breaks and then automatically deducting that time from their shift totals, depriving them of compensation, including overtime pay.[3] A third Plaintiff, Nina Johnson, who worked as

---

[1] 29 U.S.C. §§ 201, *et seq.*

[2] 43 Pa. Cons. Stat. Ann. §§ 333.101, *et seq.*

[3] Compl. at ¶¶ 10-15, 46-49.

a nursing assistant at Eagleville Hospital, joined the suit in 2016. Defendant has denied, and continues to deny, Plaintiffs' allegations.

In October 2016, Plaintiffs sought conditional certification of an FLSA collective consisting of "[a]ll persons who have worked for Defendant as a Registered Nurse, Nursing Assistant, Licensed Practical Nurse, or Mental Health Technician" during any work week in the previous three years.[4] After briefing by the parties, the Court granted conditional certification and authorized Plaintiffs to disseminate opt-in forms to potential collective members.[5] Subsequently, 71 employees, including Nina Johnson, filed consent forms to join Plaintiffs' FLSA claim.[6]

From June 2016 through June 2017, the parties engaged in document discovery. Defendant produced hiring, training and compliance materials, e-mails, meeting minutes, Human Resources materials, its Employee Handbook and Policy Manual, daily timekeeping and payroll reports for the Named Plaintiffs, as well as employment dates, rates of pay and work assignments for the entire Settlement Class.[7] At the same time, the parties worked towards a negotiated settlement. On August 21, 2017, the parties engaged in a full-day mediation session with Hon. Diane Welsh (Ret.) of JAMS, an experienced wage and hour mediator. After further discussions and exchange of information, the parties signed a Settlement Agreement on September 21, 2017.

Plaintiffs moved for preliminary approval of the Settlement Agreement as well as preliminary certification of a PMWA settlement class and FLSA settlement collective. On December 20, 2017, the Court held a preliminary approval hearing. At the hearing, the Court

---

[4] Doc. No. 27.

[5] Doc. Nos. 31, 32, 36, 37.

[6] Pls.' Mem. in Support of Final Settlement Approval (Doc. No. 55-3) at 2.

[7] Cohen Decl. (Doc. No. 55-8) at ¶ 2.

asked the parties to modify the release clause of the Settlement Agreement to limit any waiver of rights by class members to claims related to the allegations in the complaint and to extend the response period for class members from 30 days to 60 days. The parties made the requested modifications to the Settlement Agreement and Notice of Settlement,[8] and the Court granted preliminary approval and certification and authorized dissemination of the Notice on December 22, 2017.[9]

The Notice of Settlement was first distributed on January 31, 2018 to 361 prospective class members, and ultimately successfully delivered to 354 class members.[10] Since then, no class members have opted out of, or objected to, the proposed settlement.[11] This Court held a Final Approval hearing on April 2, 2018, at which no class members objected or appeared. During and after the hearing, the Court directed the parties to reconsider the confidentiality provision of the Settlement Agreement (Section 7.4), which the Court found to be inconsistent with the informational purposes and the non-retaliation provision of the FLSA.[12] The parties subsequently submitted a signed modification to the Settlement Agreement removing the confidentiality provision.[13]

## II.     THE PROPOSED SETTLEMENT AGREEMENT

Pursuant to the Settlement Agreement, Defendant will pay a total of $520,000.00 to

---

[8] Modification to Agreement dated December 21, 2017 (Doc. No. 55-5).

[9] Order Granting Preliminary Class and Collective Action Settlement Approval (Doc. No. 51).

[10] Pls.' Mem. in Support of Final Settlement Approval (Doc. No. 55-3) at 5; Kratz Decl. (Doc. No. 55-7) at ¶¶ 6-8. The Settlement Agreement, as well as Plaintiffs' Memorandum in Support of Preliminary Approval, stated that the PMWA Class consisted of 364 prospective members. The parties have since confirmed that this number mistakenly included three individuals whose employment with Defendant ended before March 2, 2014, and who the parties agree would not have timely claims under the PMWA. *See* Correspondence from Plaintiffs' Counsel, dated April 19, 2018.

[11] Kratz Decl. (Doc. No. 55-7) at ¶¶10-11.

[12] *See* Order dated April 4, 2018 (Doc. No. 58).

[13] Modification to Collective/Class Action Settlement Agreement dated April 6, 2018.

resolve this litigation.[14]  This payment includes the following components: $180,500.00 in damages to the 361 PMWA Class Members, $127,000.00 in damages to the 73 FLSA Collective members, $12,500.00 in enhancement awards to the two Named Plaintiffs and one pre-certification Opt-In Plaintiff ($320,000.00 total), $182,000.00 in attorney's fees, $10,000.00 to reimburse for "out-of-pocket" costs incurred by Class Counsel and $8,000.00 in settlement administration costs.[15]  In particular, damages to the PMWA class members and FLSA Collective members will be distributed such that each of the PMWA members will receive a lump sum of $500, while each of the FLSA Collective members will also receive individualized additional damages based on actual weeks worked, hours per week worked, and rate of pay during the relevant time period.

In exchange, the Settlement Class Members will release Defendant from any and all claims for unpaid wages, overtime or other compensation and all other relief under the FLSA and all other state and local wage/hour and wage payment laws and common law theories arising or accruing prior to the approval date of the parties' settlement that relate to allegations made in Plaintiffs' December 30, 2015 Complaint.[16]

## III.    DISCUSSION

Plaintiffs ask the Court to certify 1) a settlement class under the PMWA consisting of the 361 employees who worked as a Registered Nurse, Nursing Assistant, Licensed Practical Nurse, or Mental Health Technician for Eagleville Hospital during any work week since March 2, 2014 ("the PMWA Class") and 2) a settlement collective under the FLSA consisting of the 73 members, including the Named Plaintiffs, who filed a consent form to join Plaintiffs' FLSA

---

[14] *Id*. at ¶ 2.13 (Exhibit A).

[15] *Id*.  As confirmed during the Final Approval Hearing, Class Counsel mistakenly calculated the amount of total damages and awards to class members as $ 332,500 in Plaintiffs' Memorandum in Support of Final Approval.

[16] *See* Dec. 21, 2017 Modification to Collective/Class Action Settlement Agreement.

claim ("the FLSA Collective"). In addition, Plaintiffs ask the Court to approve the terms of the proposed settlement agreement, to award enhancement payments to Plaintiffs Galt, Murphy, and Johnson, and to award attorneys' fees and expenses. The Court addresses these issues in turn.

## A. Class Certification under Rule 23

To certify a class, the requirements of Federal Rules of Civil Procedure 23(a) and 23(b) must be satisfied.[17] "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."[18]

### 1. *Rule 23(a) Factors*

Under Rule 23(a), Plaintiffs must demonstrate: (1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation: the representative parties will fairly and adequately protect the interests of the class.[19]

#### a. Numerosity

In evaluating numerosity, courts assess whether there are enough prospective class members that joinder of all the members would be impracticable.[20] Although there is no minimum class size required for numerosity, courts have generally found that the requirement is satisfied when there are over 40 prospective class members.[21] In this case, there are 361 prospective class members, and such a number is sufficiently numerous that joinder of all

---

[17] *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746,756 (E.D. Pa. July 18, 2016).

[18] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (citation omitted).

[19] *Rouse v. Comcast Corp.*, No. 14-1115, 2015 WL 1725721, at *2 (E.D. Pa. Apr. 15, 2015) (citing Fed. R. Civ. P. 23(a)).

[20] Fed. R. Civ. P. 23(a)(1).

[21] *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir. 2001); *Eisenberg v. Gagnon,* 766 F.2d 770, 785–86 (3d Cir. 1985).

members would be impracticable.

## b. Commonality

The commonality requirement is satisfied if there is at least one question of law or fact common to the class.[22]  "Their claims must depend upon a common contention," such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[23]

Here, all prospective class members worked in patient-facing positions at Eagleville Hospital that required them to work through meal breaks and were subject to the same timekeeping policies that prevented them from recording time worked during their meal breaks. Moreover, they seek similar legal remedies pursuant to the FLSA and the PMWA.  These shared legal and factual issues are sufficient to satisfy the commonality requirement.

## c. Typicality

The typicality requirement is satisfied if the claims of the representative parties are typical of the claims of the class.[24]  The typicality requirement is specifically "designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals,"[25] and to avoid situations where the legal theories of the named plaintiffs conflict with the legal theories of the absentees.[26] "Class members are not required to have identical claims or underlying factual circumstances; if the claims at issue arise from the same practice or course of conduct, or are based on the same

---

[22] *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527–28 (3d Cir. 2004).

[23] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations and citations omitted).

[24] Fed. R. Civ. P. 23(a)(3).

[25] *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (citation omitted)..

[26] *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 57–58 (3d Cir. 1994).

underlying legal theory, the typicality requirement will be satisfied."[27]

Here, as discussed above, the Named Plaintiffs' claims are based on Defendant's alleged failure to compensate them for time spent working during meal breaks, and they seek compensation for this unpaid time. The prospective class members have claims that rely on the same policies and procedures and entitle them to the same types of relief. Thus, the interests of the Named Plaintiffs align with those of the prospective class members, and the typicality requirement is satisfied.

### d. Adequacy of Representation

Class members are adequately represented if class counsel is qualified to represent the class and the interests of the class representatives are not in conflict with the interests of the class members.[28] Here, Class Counsel, including Mr. David Cohen, and other members of the law firm, Stephan Zouras LLP, are experienced in handling class and collective actions, including cases arising under the FLSA and other wage and hour laws, and have represented Plaintiffs and the prospective class competently throughout the course of this litigation and during settlement negotiations. In addition, as discussed above with respect to typicality, the interests of the Named Plaintiffs are appropriately aligned with those of the other prospective class members.

### 2. *Rule 23(b) Requirements*

If the Court determines that a putative class satisfies the requirements of Rule 23(a), it must also determine whether the class falls into one of the categories enumerated in Rule 23(b). Plaintiff in this action seeks certification under Rule 23(b)(3), which provides:

A class action may be maintained if Rule 23(a) is satisfied and if the court finds that the questions of law or fact common to class members predominate over any questions

---

[27] *Rouse*, 2015 WL 1725721, at *3 (citing *In re Prudential,* 148 F.3d at 311–12).

[28] *In re Warfarin,* 391 F.3d at 532; *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 800 (3d Cir.1995).

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[29]

These two requirements are generally referred to as "predominance" and "superiority."[30]  When assessing predominance and superiority for settlement purposes only, a showing of manageability of trial is not required.[31]

a. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated."[32]  This requirement imposes a more "rigorous obligation" upon the Court than Rule 23(a)'s commonality requirement.[33]  In analyzing predominance, the focus of the Court's inquiry is on "whether [the] defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."[34]

Here, as discussed, Plaintiffs have alleged that Defendant engaged in a common course of conduct that harmed all class members, specifically, that Defendant required certain categories of employees to work during meal breaks without providing a system for logging such hours, and thus failed to compensate the employees for that time.  Accordingly, the Court finds that the

---

[29] Fed. R. Civ. P. 23(b)(3).

[30] *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 310 (3d Cir. 2008).

[31] *In re Prudential,* 148 F.3d at 313–16.

[32] *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 297 (3d Cir. 2011) (citations and internal quotations omitted).

[33] *See id.*

[34] *See id.* at 298.

issues common to the prospective class members predominate over their individual issues.

### b. Superiority

To satisfy the superiority test, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."[35] Here, the record in this case does not indicate a strong interest among class members in individually controlling the prosecution of a separate action. As discussed, none have opted out of, or objected to, the terms of the parties' settlement. Moreover, Plaintiffs have calculated the maximum total compensatory damages for the class to be approximately $491,666.00, providing an average individual recovery of less than $1,400. This amount provides relatively little incentive for individuals to bring separate lawsuits to vindicate their rights.[36] In addition, because all the alleged relevant conduct took place at one local hospital, this Court is the most convenient forum for litigating all of the class members' claims. For these reasons, the superiority requirement is satisfied.

Because Plaintiffs have satisfied the relevant requirements of Rule 23 to obtain class certification, the Court will certify the class for purposes of settlement.

### B. FLSA Collective Certification

Where, as here, a Court has already conditionally certified a FLSA collective, a Court must make "a conclusive determination as to whether each plaintiff who has opted into the collective action is in fact similarly situated to the named plaintiff" prior to granting final certification.[37] In deciding whether the proposed collective members are in fact similarly situated, the Court considers: "whether the plaintiffs are employed in the same corporate

---

[35] *In re Prudential,* 148 F.3d at 316 (citations and internal quotations omitted).

[36] *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997).

[37] *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (citation and internal quotation marks omitted).

department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment."[38]

Here, as discussed, the 71 FLSA opt-in members each worked in patient-facing roles at Eagleville Hospital's single location in Eagleville, Pennsylvania. Each is asserting FLSA and PMWA claims based on time worked during unpaid meal breaks, and seek compensation for their unpaid work. While the members of the collective do have different salaries, titles, and work schedules, their pay and conditions of employment are sufficiently comparable for their interests to be aligned. Thus, the 71 opt-in members of the FLSA collective are similarly situated to the Named Plaintiffs, and the Court will grant final certification for purposes of this settlement.

### C. Fairness of the Proposed Settlement

#### 1. *Initial Presumption of Fairness*

In this Circuit, a settlement is entitled to an initial presumption of fairness where it resulted from arm's-length negotiations between experienced counsel, there was sufficient discovery, and there were no objectors and only a small percentage of opt-outs.[39] Here, the Court finds that the settlement is entitled to an initial presumption of fairness. The settlement resulted from multiple days of arms-length negotiations between experienced counsel, before an experienced and independent mediator. In addition, Class Counsel outlined the factual investigation undertaken prior to settlement, which includes a detailed review of the pay records

---

[38] *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536-37 (3d Cir. 2012).

[39] *Gen Motors*, 55 F.3d at 785; *see also In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A presumption of correctness is said to attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003) ("[S]ettlement negotiations took place at arm['], s length between highly experience[d] and competent counsel. Their assessment of the settlement as fair and reasonable is entitled to considerable weight.").

of each of the FLSA collective members. Moreover, there are no objectors and or opt-outs to the settlement.  In light of these considerations, the settlement is entitled to an initial presumption of fairness.

## 2. *The Settlement Satisfies the Girsh Factors*

After determining whether an initial presumption applies, the courts must also consider the nine factors articulated by the Third Circuit in *Girsh v. Jepson*[40] in evaluating whether a proposed settlement is fair, adequate, and reasonable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[41]

The Court may make findings regarding the *Girsh* factors where appropriate,[42] and may not "substitute the parties' assurances or conclusory statements for [its own] independent analysis of the settlement terms."[43]

### a. Complexity, Expense and Duration of Litigation

This first *Girsh* factor requires the Court to consider "the probable costs, in both time and money, of continued litigation."[44]  This action involves complex factual issues relating to Defendant's policies and practices that, if litigated to trial, would require substantial additional class-wide merits and damages discovery, including depositions of Plaintiffs and significant

---

[40] 521 F.2d 153 (3d Cir. 1975).

[41] *Id*. at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (alterations omitted)).

[42] *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).

[43] *Id.* at 350-51.

[44] *In re Gen. Motors*, 55 F.3d at 812 (internal quotations and citation omitted).

numbers of Defendant's employees, as well as extensive motion practice concerning class certification and summary judgment. Considering the likely long duration of such litigation, a settlement at this stage avoids the significant costs and risks associated with protracted litigation. For these reasons, this factor weighs in favor of settlement.

### b. Reaction of Class to Settlement

The second *Girsh* factor also weighs in favor of settlement. As discussed, no potential class members have objected to, or sought exclusion from, the proposed settlement. These facts indicate consent on the part of the class to the terms of the settlement.[45] Accordingly, the reaction of the class in this case strongly supports the approval of the settlement.

### c. State of the Proceedings and Amount of Discovery Completed

In evaluating the third *Girsh* factor, the Court assesses "the degree of case development that [C]lass [C]ounsel have accomplished prior to the settlement," in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating."[46] Here, the parties have completed sufficient discovery to understand the strengths and weaknesses of the case over the course of negotiating a settlement. Specifically, Class Counsel collected and reviewed a substantial volume of documents pertaining to Defendant's policies and procedures as well as payroll records of each of the FLSA collective members in order to investigate the factual support for the legal claims. Altogether, the parties spent over twenty-one months litigating and negotiating a resolution before reaching a settlement. Accordingly, the Court finds that the settlement reached here resulted from informed negotiations between experienced counsel who fully appreciated the merits and risks of this case, and thus the third *Girsh* factor

---

[45] *See, e.g., Bredbenner v. Liberty Travel, Inc.*, No. 09-905, 2011 WL 1344745, at *12 (D.N.J. Apr. 8, 2011) (finding that the second *Girsh* factor weighed in favor of settlement where there were no objectors to settlement and less than one percent of potential class members opted out).

[46] *In re Gen. Motors*, 55 F.3d at 813.

weighs in favor of settlement approval.

### d. Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors require the Court to "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."[47] Here, Plaintiffs acknowledge that if they proceed to trial, the class members face a substantial risk of substantially reduced recovery or no recovery at all in this action. In particular, Defendant contends that a portion of the class members worked substantially less than 40 hours a week, undermining their entitlement to any overtime claim under the FLSA. More importantly, Defendant may be able to avoid class-wide relief altogether by successfully defeating class certification prior to trial. Because these risks are eliminated by the certainty of immediate payment through the proposed settlement, the Court finds that the fourth and fifth *Girsh* factors weigh in favor of settlement.

### e. Risks of Maintaining the Class Action Through Trial

While the significance of this sixth *Girsh* factor in the settlement context has been questioned,[48] the practical and legal risks of decertification would favor settlement in this case. Defendant has stated that it intends to contest certification should the case proceed, and regardless of whether such a challenge would succeed, such contested motion practice is likely to increase both the length and expense of the litigation.

### f. Ability of Defendant to Withstand a Greater Judgment

The seventh *Girsh* factor examines whether Defendant "could withstand a judgment for

---

[47] *In re Prudential*, 148 F.3d at 319.

[48] *Id.* at 321.

an amount significantly greater than the Settlement."[49]  Here, the parties have not presented
evidence concerning Defendant's ability to withstand a greater judgment, and thus this factor is
neutral in this case.

g. <u>The Range of Reasonableness</u>

The eighth and ninth *Girsh* factors "evaluate whether the settlement represents a good
value for a weak case or a poor value for a strong case."[50]  In weighing these two factors, courts
must decide "whether the settlement is reasonable in light of the best possible recovery and the
risks the parties would face if the case went to trial."[51]  Specifically, courts should compare the
amount of the proposed settlement with "the present value of the damages plaintiffs would likely
recover if successful, appropriately discounted for the risk of not prevailing" to make this
determination.[52]

Based upon Plaintiffs' testimony that they performed about eight hours of meal break
work per month, Plaintiffs calculated the maximum total compensatory damages of the class to
be approximately $491,666.  Under the terms of the settlement, class members will recover a
total of $307,500 in damages and unpaid wages, exclusive of enhancement awards to the Named
Plaintiffs and Plaintiff Nina Johnson. This represents approximately 62.5% of the maximum total
compensatory damages.  Taking into account the uncertainty of proving meal break hours
worked by each class member and of class certification in response to a contested motion, the
Settlement Amount represents a significant recovery of the unpaid wages that could have
reasonably been proven at trial.  In light of the risks associated with continued litigation, the
Court finds the final two *Girsh* factors weigh in favor of settlement.

---

[49] *In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001).

[50] *In re Warfarin*, 391 F.3d at 538.

[51] *In re Prudential*, 148 F.3d at 322.

[52] *Id.*

### 3. *Purposes of the FLSA*

The Court also finds that in light of the parties' modifications to the release and confidentiality provisions of the Settlement Agreement, the agreement as a whole is consistent with, and will not frustrate, the purposes of the FLSA. First, at the Court's direction following the preliminary approval hearing, the parties have limited the release provision to apply only to claims related to the allegations contained in the Complaint. Thus, the proposed settlement does not preclude class members from later asserting wage and hours claims that do not arise from the unpaid meal break allegations at issue in this lawsuit. Second, at the Court's direction, the parties have removed the confidentiality provision of the Settlement Agreement, which would likely have frustrated the FLSA informational purposes and undermined the express non-retaliation provision of the FLSA.[53] As modified, the Settlement Agreement will permit Plaintiffs to discuss the terms of the Agreement with members of the public, including Defendant's other employees, without facing liability for breach of contract.[54]

Accordingly, after applying the presumption of fairness to which the settlement is entitled, and considering the *Girsh* factors alongside the purposes of the FLSA, the Court concludes the class action settlement is fair, reasonable, and adequate. The Court will grant final

---

[53] *See, e.g.*, *Mabry v. Hildebrandt*, No. 14-5525, 2015 WL 5025810, at *2-3 (E.D. Pa. Aug. 24, 2015) (denying approval of confidentiality provision that prohibited Plaintiff from disclosing "to others the fact or terms of this Agreement, except that [the plaintiff] may disclose such information to his spouse, attorney, and/or accountant . . ." on the grounds that such a provision prevented the plaintiff from discussing the settlement with [the] [d]efendants' employees in contravention of the purposes of the FLSA); *Altenbach v. Lube Ctr., Inc.*, No. 1:08-CV-02178, 2013 WL 74251, at *3 (M.D. Pa. Jan. 4, 2013) (declining to approve a settlement agreement prohibiting the plaintiff and class counsel from disclosing "any specific information concerning the [s]ettlement with the [d]efendant, such as the settlement amount, to any person or agency . . . ."); *Brumley v. Camin Cargo Control, Inc.*, No. 08-1798, 2012 WL 1019337, at *6-7 (D.N.J. Mar. 26, 2012) (holding that a confidentiality provision prohibiting the plaintiffs from disclosing "the terms of the [a]greement to any person or organization, including but not limited to . . . employees and agents of [the defendant] . . . and other members of the public" "thwarts the informational objective of the notice requirement [of the FLSA] by silencing the employee who has vindicated a disputed FLSA right" and, if enforced, "empowers an employer to retaliate against an employee for exercising FLSA rights").

[54] Such discussions would, however, be limited by the terms of the separate non-derogation provision of the settlement agreement.

approval of the settlement agreement.

### D. Incentive Payments to Class Representatives

Incentive payments may be approved to compensate class representatives for services they provide and risks they incur during the course of litigation as well as to reward the members for the benefit they provide to the class and to the public.[55]  Where the enhancement payment comes out of the common fund independent of attorneys' fees, the Court must "carefully review" the request for fairness to other class members.[56]

Here, Plaintiffs seek an enhancement payment of $5,000 to each of the two Named Plaintiffs, Adrienne Galt and Nancy Murphy, and $2,500 to Nina Johnson, the pre-certification opt-in Plaintiff.  Class Counsel asserts that these Plaintiffs were directly and regularly involved in this litigation and accepted both financial and reputational risks by commencing and supporting it.  In particular, Plaintiffs produced documents to describe and confirm their claims, assisted with the review of case documents to inform litigation strategy, spoke with putative class members and encouraged their cooperation and assistance in the prosecution of the case, reviewed pleadings for accuracy, provided declarations in support of motions, responded to written discovery requests, assisted in preparations for settlement negotiations, and reviewed the fairness of Defendant's settlement proposals.  These services will benefit all class members through the proposed settlement, and the enhancement payment sought in this case is consistent with awards granted in similar cases.[57]

---

[55] *See Bredbenner*, 2011 WL 1344745, at *22 (citing *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 1990)); *Hall v. Best Buy Co., Inc.*, 274 F.R.D. 154, 173 (E.D. Pa. 2011).

[56] *Bredbenner*, 2011 WL 1344745, at *22.

[57] *Rouse*, 2015 WL 1725721, at *10-11 ($2,500); *In re Am. Inv'rs. Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 245 (E.D. Pa. 2009) (between $5,000 and $10,000); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 412 (D.N.J. 2006) ($12,000); *Varacallo v. Massachusetts Mut. Life Ins. Co,* 226 F.R.D. 207, 259 (D.N.J. 2007) ($3,000 to $10,000).

Accordingly, the Court finds the requested enhancement payments here are reasonable and will award the amounts requested.

### E. Attorneys' Fees

Plaintiffs have requested a total of $182,000 in attorneys' fees. Two methods may be used for calculating attorneys' fees in class or collective action lawsuits: the lodestar method and the percentage-of-recovery method.[58] In the Third Circuit, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund"[59] and is also the prevailing methodology used by courts in the Third Circuit for wage and hour cases.[60] When a district court uses the percentage of recovery method, it "first calculates the percentage of the total recovery that the proposal would allocate to attorneys['] fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case."[61] The Court's analysis is guided by seven factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.[62]

After considering these factors, courts may also "cross-check the percentage award at which they arrive against the 'lodestar' award method."[63]

#### 1. Size of the Fund and the Number of Persons Benefitted

In the Third Circuit, courts have approved attorneys' fees awards ranging from

---

[58] *In re Gen. Motors*, 55 F.3d at 820-21.

[59] *In re Prudential*, 148 F.3d at 333.

[60] *Bredbenner*, 2011 WL 1344745, at *19.

[61] *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL 950616, at *20 (E.D. Pa. Apr. 22, 2005) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001)).

[62] *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

[63] *Id.*

approximately 19% to 45% of the common fund as reasonable.[64]  Here, the common fund

created by the Settlement Agreement will benefit 361 class members, and the requested fee

award represents approximately 35% of the common fund.  This percentage falls within the

range of fee awards accepted by courts in the past and thus weighs in favor of approval.

### 2.  *Substantial Objections By Class Members*

As discussed, there have been no objections to any aspect of the settlement agreement in

this case, including to the attorneys' fees award.  The absence of objections favors awarding the

requested fees.[65]

### 3.  *The Skill and Efficiency of the Attorneys Involved*

The skill and efficiency of the attorneys involved is "measured by the quality of the result

achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience

and expertise of the counsel, the skill and professionalism with which counsel prosecuted the

case and the performance and quality of opposing counsel."[66] As noted, Class Counsel in this

matter has requisite experience handling complex wage and hour class actions, and they have

represented the Plaintiffs and the prospective class competently and diligently throughout the

course of this litigation.  This factor also weighs in favor of awarding the requested attorneys'

fees.

### 4.  *The Complexity and Duration of the Litigation*

As discussed, the parties reached a tentative settlement agreement approximately twenty-

one months into this case.  Courts have generally found FLSA claims and wage-and-hour law

---

[64] *See In re Gen. Motors*, 55 F.3d at 822.

[65] *In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005).

[66] *Nichols*, 2005 WL 950616, at *22 (internal quotation omitted).

enforcement litigation to be complex.[67]  While this case may not be substantially more complex than other wage and hour cases, the Class Counsel has reasonably devoted substantial time and resources to the litigation, and this factor weighs in favor of awarding the requested attorneys' fees.

### 5.  Risk of Non-Payment

Class Counsel took this case on a contingent fee basis and faced the risk of non-payment should they fail to obtain an adequate recovery for Plaintiffs and the Class.  Having assumed this risk and devoted significant time to this matter, the Court finds that this factor weighs in favor of awarding the requested fees.

### 6.  Hours Devoted by Counsel

Class Counsel assert that they have spent over 400 hours of attorney time on this case since its inception in addition to time spent by their staff.  The Court finds that the time devoted to this case was significant, and this factor weighs in favor of finding the award reasonable.

### 7.  Awards in Similar Cases

As discussed, most fee awards in common fund cases range from 19% to 45% of the settlement fund, with 25% being the median.[68]  More specifically, fee awards ranging from 30% to 43% have been awarded in cases with funds ranging from $400,000 to $6.5 million—funds which are comparatively smaller than many common funds.[69]  The Court finds that this factor also weighs in favor of awarding Class Counsel their requested fee amount.

---

[67] *McGee v. Ann's Choice, Inc.*, No. 12-2664, 2014 WL 2514582, at *5 (E.D. Pa. June 4, 2014).

[68] *See Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 341 (W.D. Pa. 1997).

[69] *Id*. at 342-43 (citing cases and noting a number of awards ranging from 30 to 36% in such cases); *see also Ratner v. Bennett*, No. 92-4701, 1996 WL 243645, at *9 (E.D. Pa. May 8, 1996) (approving a fee award amounting to 35% of the settlement in a class action settlement with a common fund of $400,000 and a class membership of 455 persons, and noting that because the common fund was relatively small, it was appropriate to give a higher percentage to Class Counsel as he "should not be penalized for undertaking and pursuing this litigation as vigorously as it would a much larger case which promises a more substantial fee award").

### 8. *Lodestar Cross-Check*

The lodestar is calculated by "multiplying the number of hours reasonably worked" by the normal hourly rates of counsel.[70] The Court may then multiply the lodestar calculation "to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation."[71]

The lodestar in this case is $76,298.82, based on the actual billing rates of all attorneys who worked on this case. A fee award of $158,865 results in a lodestar multiplier of 0.6. The Third Circuit has recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."[72] The lodestar cross-check therefore results in a multiplier below the range frequently awarded in common fund cases in this Circuit. Thus, the Court finds that the lodestar cross-check confirms the reasonableness of the attorneys' fee award here.

### F. Costs

Class Counsel has requested an award of costs of approximately $10,000 to cover out-of-pocket expenses associated with this litigation. There have been no objections to the request for costs. In light of the length of the litigation and the number of filings by the parties, the Court finds the requested award to be reasonable.

### G. Payment to Settlement Administrator

Finally, Plaintiffs have requested payment of $8,000 to the appointed Settlement Administrator, Dahl Administrator, as compensation for their efforts in preparing and disseminating the Class Notice mailing, engaging in necessary re-mailing efforts, responding to

---

[70] *In re Rite Aid*, 396 F.3d at 305, 306 n.16 (internal citation omitted).

[71] *In re Ikon Office Sols. Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000).

[72] *In re Prudential*, 148 F.3d at 341.

inquiries and requests from Class Members and the parties' counsel, reviewing Defendant's time and pay data to perform the Class Members' individual damage calculations, creating and mailing the settlement checks, providing necessary tax forms, and providing other ancillary services.  In the absence of any objections from class members, the Court finds the requested payment to be fair and reasonable in light of the efforts expended.

## IV.     CONCLUSION

For these reasons, the Court will certify the PMWA Settlement Class and FLSA Settlement Collective and grant final approval of the parties' Settlement Agreement, as amended by the modifications dated December 21, 2017 and April 6, 2018, including the enhancement awards to the Named Plaintiffs and Plaintiff Nina Johnson, the requested attorneys' fees and costs, and payment to the Settlement Administrator.  An appropriate order follows.